IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MATTHEW A. NELSON,

      Plaintiff,

v.                                                                               CIV 17-0516 MV/JHR

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

## **PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

This matter has been referred to the undersigned to issue proposed findings and recommend an ultimate disposition of this Social Security appeal. *Doc. 24*. Having carefully reviewed the parties' arguments and the relevant portions of the Administrative Record ("*AR*"), the Court recommends that Plaintiff's Motion to Remand or Reverse Agency Decision be granted, for the reasons set forth below.

### I.    INTRODUCTION

Mr. Nelson claims that he was rendered unable to work after falling off of a ladder on March 20, 2013. *AR* at 51-52. However, according to consultative examiner Robert Krueger, Ph.D., (who was hired by the Administration), Mr. Nelson is afflicted by more than just physical ailments; he suffers from borderline intellectual functioning, an unspecified learning disorder, depressive disorder NOS, adjustment disorder with anxiety, and pain disorder associated with a general medical condition and psychological factors. *AR* at 716. In reaching these diagnoses, Dr. Krueger administered a WAIS-IV test, which "indicate[s] that he has significant cognitive impairment and is functioning at a borderline level with most skills." *Id.* However, the Administrative Law Judge ("ALJ") assigned to Mr. Nelson's case rejected many of the

1

functional limitations imposed by Dr. Krueger, primarily because she disagreed with the Global Assessment of Functioning ("GAF") score he assessed, and ignored evidence that Mr. Nelson's processing speed is hampered by his disabilities. The Court finds that the ALJ's reasoning and rationale for rejecting Dr. Krueger's opinions are unsupported, and so recommends that this case be remanded for proper evaluation of Mr. Nelson's mental impairments.

## II. PROCEDURAL HISTORY

Mr. Nelson fell while working on a ladder on March 20, 2013. *AR* at 51-52. Due to the injuries he sustained, Mr. Nelson filed an application with the Social Security Administration for disability insurance benefits under Title II of the Social Security Act on May 1, 2014. *AR* at 218-19. In addition to his back injuries, Mr. Nelson alleged disabling conditions including a seizure disorder and learning disability. *AR* at 236.

Mr. Nelson's application was denied initially and upon reconsideration. *AR* at 83-112. He requested review, and, after holding a *de novo* hearing, ALJ Michelle K. Lindsay issued an unfavorable decision on November 21, 2016. *AR* at 10-34. Mr. Nelson requested that the Appeals Council review the ALJ's decision; however, the Appeals Council denied his request on March 1, 2017. *AR* at 1-8. As such, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). Mr. Nelson filed a timely Complaint on May 2, 2017. *Doc. 1*.

This Court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g) and 20 C.F.R. § 422.210(a). A claimant seeking disability benefits must establish that he is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The Commissioner must use a five-step sequential evaluation process to determine eligibility for benefits. 20 C.F.R. § 404.1520(a)(4).[1]

At step one of the sequential evaluation process, the ALJ found that Mr. Nelson had not engaged in substantial gainful activity during the relevant time period. *AR* at 15. At step two, she determined that Mr. Nelson "had the following severe impairments: seizure disorder, degenerative disc disease of the lumbar spine post lumbar surgery, mild degenerative joint disease of the hips, borderline intellectual functioning, learning disorder not otherwise specified (NOS), depressive disorder NOS, and adjustment disorder with anxiety." *AR* at 15. At step three, however, the ALJ found that Mr. Nelson "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments[.]" *AR* at 16.

When a claimant does not meet a listed impairment, the ALJ must determine his residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p, 1996 WL 374184, at *1; *see* 20 C.F.R. § 404.1545(a)(1). In this case, the ALJ determined that Mr. Nelson retained the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) with the ability to lift, carry, push, and pull 10 pounds occasionally. He should have the option to alternate between sitting and standing every 15 minutes. The claimant is able to

---

[1] The Tenth Circuit summarized these steps in *Allman v. Colvin*, 813 F.3d 1326, 1333 n.1 (10th Cir. 2016):

> At step one, the ALJ must determine whether a claimant presently is engaged in a substantially gainful activity. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). If not, the ALJ then decides whether the claimant has a medically severe impairment at step two. *Id.* If so, at step three, the ALJ determines whether the impairment is "equivalent to a condition 'listed in the appendix of the relevant disability regulation.'" *Id.* (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004)). Absent a match in the listings, the ALJ must decide at step four whether the claimant's impairment prevents him from performing his past relevant work. *Id.* Even if so, the ALJ must determine at step five whether the claimant has the RFC to "perform other work in the national economy." *Id.*

occasionally climb stairs and ramps, balance, stoop, crouch, kneel, and crawl, but can never climb ladders, ropes or scaffolds. He should avoid more than occasional exposure to extreme cold. The claimant should completely avoid unprotected heights, open flame, open bodies of water, and hazardous machinery. Mentally, the claimant is able to understand, remember and carry out simple instructions and is able to maintain attention and concentration to perform simple tasks for two hours at a time without requiring redirection of task. He can have only occasional contact with the general public, and only superficial interactions with coworkers and supervisors. He requires work involving no more than occasional change in the routine work setting, and no more than occasional independent goal setting or planning. The claimant requires work that does not involve travel to unfamiliar places or the use of public transportation as part of the job.

*AR* at 18. Employing this RFC at step four, the ALJ determined that Mr. Nelson could not return to his past relevant work as a tree trimmer and a painter. *AR* at 27. However, she found that "there were jobs that existed in significant numbers in the national economy that [Mr. Nelson] could have performed[.]" *AR* at 28. Specifically, the ALJ found that Mr. Nelson could have performed the requirements of a table worker, small item inspector, or small product assembler. *Id.* Accordingly, the ALJ determined that Mr. Nelson "was not under a disability, as defined in the Social Security Act, at any time from March 20, 2013, the alleged onset date, through September 30, 2016, the date last insured[,]" and she denied benefits. *AR* at 29.

### III. LEGAL STANDARD

This Court "review[s] the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).

### IV. ANALYSIS

Mr. Nelson argues that the ALJ's RFC finding was made in error because she improperly rejected the GAF of 45 in the Dr. Krueger evaluation; improperly rejected the entire Krueger

4

report; improperly evaluated the treating doctor's opinion; "erred in the assessment of Mr. Nelson's mental condition for allegedly failing to obtain mental treatment[;]" understated Mr. Nelson's mental limits; and erred in her credibility assessment of Mr. Nelson and his "companion." He further argues that the ALJ misstated the burden of proof at step five and "failed to assure that the [Vocational Expert] testimony was compliant with the D.O.T." *See Doc. 15* at 1-2. Because the Court agrees that the ALJ erred in weighing Dr. Krueger's opinion and GAF score, the undersigned will not address Plaintiff's other claims of error, "because they may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

Robert Krueger, Ph.D., FICPP, examined Mr. Nelson at the request of the Administration on March 16, 2015. *AR* at 713-718. Dr. Krueger conducted a clinical interview with biopsychosocial history and mental status examination, Wechsler Adult Intelligence Scale – IV (WAIS-IV), and reviewed Mr. Nelson's function report.[2] *AR* at 713. When he administered the WAIS-IV, Mr. Nelson was "compliant with following all test instructions" and "appeared to make a good effort." *AR* at 715. As such, Dr. Krueger considered his results to be valid. *Id.* Dr. Krueger offered the following "diagnostic impression" in conformance with the DSM-IV:[3]

| | |
|---|---|
| Axis I: | Depressive Disorder NOS; Adjustment Disorder with anxiety; Learning Disorder NOS; Pain Disorder, associated with a general medical condition and psychological factors |
| Axis II: | Borderline Intellectual Functioning |
| Axis III: | Diagnosis deferred, see medical records |

---

[2] Dr. Krueger states that he conducted a "Review of Documents" when reviewing Mr. Nelson's case; however, the only document he reviewed was Mr. Nelson's function report. *AR* at 712.

[3] Why Dr. Krueger was relying on the DSM-IV is unclear to the Court. The DSM-5 was published on May 18, 2013. However, the Administration appears to contemplate the "learning curve" demonstrated by Dr. Krueger's use of the DSM-IV two years after the DSM-5 was published: "The DSM-5 is a lengthy and complex tome, different in many respects from its predecessors the DSM-IV and DSM-IV-TR. It will not only require a learning curve from legal practitioners to understand how best to utilize the text and the tools it contains, but it will equally take time for psychological and psychiatric clinicians to make the adjustment. Remember it is new to them as well." Global Assessment of Function (GAF), 2 Soc. Sec. Disab. Claims Prac. & Proc. § 22:243 (2nd ed. 2017).

>   Axis IV:    Psychosocial stressors appear to be quite severe, and include having severe and chronic pain, ongoing medical issues, loss of former activities, and lack of income
>   Axis V:     GAF, Recent: 45

*AR* at 716. In his "summary and recommendations," Dr. Krueger stated that "there is evidence of [Mr. Nelson] having a severe and chronic pain disorder, which is likely to be further exacerbated by emotional factors, such as depression." *AR* at 716. Dr. Krueger further opined that Mr. Nelson's results on the WAIS-IV "indicate that he has significant cognitive impairment and is functioning at a borderline level with most skills." *AR* at 716-717. Dr. Krueger concluded as follows:

> Because of chronic pain, ongoing medical issues, depression, and learning disorders Mr. Nelson can be expected to have moderate impairment with understanding, remembering, and following simple work instructions and marked impairment with complex or detailed instructions. He has serious problems with visual motor working speed, as is evidenced by his Processing Speed Index score of 74. He also appeared to be quite physically limited because of severe and chronic pain. He can be expected to have marked impairment with maintaining pace and persistence. In his current condition he can be expected to have marked impairment with adjusting to changes in work environment. Because of ongoing emotional difficulties along with cognitive impairment, Mr. Nelson can be expected to have moderate impairment in many relationships with coworkers, supervisors, and the general public. At the present time he can be expected to have marked impairment with traveling to distant places alone. Because of chronic pain and reported physical limitations, cognitive impairment, and ongoing emotional difficulties Mr. Nelson can be expected to have marked impairment with being aware of and reacting appropriately to dangers in many work environments.

*AR* at 717.

The ALJ afforded "little weight" to the assessment of Dr. Krueger, thereby "effectively rejecting" it under Tenth Circuit law. *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (equating "according little weight to" an opinion with "effectively rejecting" it); *Crowder v. Colvin*, 561 F. App'x 740, 742 (10th Cir. 2014) (citing *Chapo* for this proposition); *Ringgold v. Colvin*, 644 F. App'x 841, 844 (10th Cir. 2016) (same). The ALJ stated that she

> considered the opinion of Dr. Krueger. However, I note that this assessment is not supported by evidence of record. For example, I note the claimant reported that he has not even sought any professional counseling or therapy. In addition, he stated that he had previously "tried" some antidepressant drug. Thus, there is no evidence to suggest the claimant's psychiatric symptoms would not improve with appropriate treatment. Furthermore, the record shows the claimant was able to work at the semi-skilled and skilled level despite his history of learning disorder and borderline intellectual functioning. There are no references from Dr. Krueger that the claimant displayed any significant deficits in persistence and pace, which would provide support for his limitation in that area. In fact, he noted the claimant make (sic) good effort and was compliant with following all test instructions. Based on the foregoing, as well as, (sic) this opinion was rendered based on one evaluation of the claimant, little weight is afforded to the assessment of Dr. Krueger.

*AR* at 27. Separately, the ALJ afforded "little weight" to Dr. Krueger's GAF score. The ALJ did so for the following reasons:

> Psychologist Krueger assigned a Global Assessment of Functioning (GAF) of 45. A GAF of 45 corresponds to serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious limitation in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders IV, page 32. The GAF, however, is not intended for forensic purposes, such as the assessment of disability or competency or the individual's control over such behavior (Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, pages 23 and 27). Therefore, little weight is afforded to this GAF score.

*AR* at 25-26.

"It is the ALJ's duty to give consideration to all the medical opinions in the record. . . . [Sh]e must also discuss the weight [s]he assigns to such opinions." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citations omitted).

> When evaluating the opinion of any medical source, an ALJ must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Kellams v. Berryhill*, 696 F. App'x 909, 917 (10th Cir. 2017) (citing *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995); 20 C.F.R. §§ 404.1527(c), 416.927(c)). "If an ALJ rejects an opinion, he 'must provide specific, legitimate reasons for rejecting it.'" *Kellams*, 696 F. App'x at 917 (citing *Chapo*, 682 F.3d at 1291).

The Court is not persuaded by the ALJ's reasons for rejecting Dr. Krueger's GAF score. Initially, the Court notes that a GAF score is a medical judgment which "may … be useful as one component of the evidence needed to support a psychiatric RFC[.]" Global Assessment of Function (GAF), 2 Soc. Sec. Disab. Claims Prac. & Proc. § 22:243 (2nd ed. 2017). As such, it must be evaluated as any other medical opinion in the record. *Id.*; *see Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 (10th Cir. 2012).[4] Mr. Nelson does not argue that the ALJ failed to evaluate

---

[4] As summarized by the Court in *Keyes-Zachary*, "The GAF is a 100–point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
    • 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
    • 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
    • 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
    • 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
    • 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
    • 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
    • 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
    • 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."

Dr. Krueger's GAF score, but that her reasons for rejecting it were unsupported. The Court agrees.

The ALJ's first reason, which effectively asserted that Mr. Nelson's GAF score was inconsistent with Dr. Kruger's examination, is unsupported by substantial evidence. As observed in Dr. Krueger's mental status examination of Mr. Nelson,

> Mr. Nelson presented as being dysphoric and depressed, and his emotional expression was blunted. He also had a strained facial expression, probably related to his pain. He reported having difficulties with anxiety, but did not appear to meet the fully criteria for having a specific anxiety disorder. Mr. Nelson seemed to minimize having difficulties with depression, but the examiner did observe signs of significant depression with him. He reported having chronic sleep disturbance. *He stated that at times he has thoughts about suicide.* He states that he feels frustrated and depressed because he can no longer work. There was no evidence of hypomania or mania and no particular evidence of bipolar disorder. Mr. Nelson appeared to have a low energy level….

*AR* at 715 (emphasis added). As emphasized above, Mr. Nelson reported suicidal ideation, which is consistent with the GAF score of 45. *See* DSM-IV at 32. Thus, the ALJ's first reason for rejecting it is unsupported by substantial evidence.[5]

---

• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

*Id.* at n.1.

[5] The ALJ attempts to minimize this error by citing to a medical record dated April 27, 2016, wherein "the claimant reported depression secondary to his medical condition but denied he was suicidal." *AR* at 26 (citing Exhibit 21F, p. 15). This note, however, states that Mr. Nelson is "[n]ot suicidal *at this time*." *AR* at 900 (emphasis added). Moreover, it is authored by a Physician's Assistant who was seeing Mr. Nelson for a chief complaint of "discuss pain doctor." *AR* at 898. Under the regulations in effect at the time Mr. Nelson's claim was filed, Physician's Assistants were not even considered "acceptable medical sources." *See* SSR 06-03P, 2006 WL 2329939 at *2. Even now, after a substantial shift in the regulations, a Physician's Assistant is only permitted to offer opinions "for impairments *within his or her licensed scope of practice*." *See* 20 C.F.R. § 404.1502 (emphasis added). As such, there is no basis for elevating these notes over those of Dr. Krueger. The same is true of the notes authored by a Licensed Clinical Social Worker, who is not an "acceptable medical source" under the current regulations. *See AR* at 888 (relied upon by the ALJ at *AR* at 26).

9

The ALJ's other reason for rejecting Dr. Krueger's GAF score fares no better. Citing specific pages of the DSM-IV, the ALJ rejected Dr. Krueger's GAF score because "[t]he GAF, however, is not intended for forensic purposes, such as the assessment of disability or competency or the individual's control over such behavior (Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, pages 23 and 27)." *AR* at 26. This same language has been upheld uncritically by other district courts in this circuit. *See, e.g.*, *Mitchell v. Berryhill*, CIV 16-1006-M, 2017 WL 2964727 at *6 (W.D. Okla. 2017). However, the Court has reviewed the pages of the DSM-IV[6] that the ALJ relied on for this proposition, and finds it to be unsupported.

While the DSM-IV does caution against its use in the forensic setting, that limitation is not restricted to the GAF scale. As stated on page xxiii of the DSM-IV under the heading "Use of DSM-IV in Forensic Settings"

> When the DSM-IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect." In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM-IV diagnosis. This might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.

---

[6] Mr. Nelson attempts to demonstrate this point by attaching the pages the ALJ cited to his opening brief. *See Doc. 16*, Exhibit A. However, Mr. Nelson's exhibits are from the DSM-IV-*TR* (emphasis added), and are, therefore, of little utility to the Court. *See id.* Mr. Nelson's confusion is understandable, however, as it appears as though the ALJ was actually referencing pages xxiii and xxvii of the DSM-IV, and not pages 23 and 27. *See* Diagnostic and Statistical Manual of Mental Disorders (4th ed.). Page 23 is from the DSM-IV's table of contents and page 27 does not discuss the GAF scale. *See id.* at 23, 27. The Court is confident that its assessment of the ALJ's error is correct because the ALJ correctly cites page 32 of the DSM-IV when describing the symptoms associated with a GAF of 45. *Id.* at 32.

> Nonclinical decision makers should also be cautioned that a diagnosis does not carry any necessary implications regarding the causes of the individual's mental disorder or its associated impairments. Inclusion of a disorder in the Classification (as in medicine generally) does not require that there be knowledge about its etiology. Moreover, the fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that the particular individual is (or was) unable to control his or her behavior at a particular time.
> …
> The use of DSM-IV in forensic settings should be informed by an awareness of the risks and limitations discussed above. When used appropriately, diagnoses and diagnostic information can assist decision makers in their determinations. . . .

*Id.* at xxiii-xxiv. This is, apparently, where the ALJ procured the language she used to discount Dr. Kruger's GAF score. *Compare AR* at 26. However, as set forth, the language speaks to the caution non-clinical decision makers must employ when using the *entire* DSM-IV diagnostic criteria in the forensic setting, not just the GAF scale.

The ALJ also appears to have relied on the "Cautionary Statement" contained on page xxvii of the DSM-IV, which states, in relevant part that:

> The purpose of the DSM-IV is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat people with various mental disorders. It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category such as Pathological Gambling or Pedophilia does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability. The clinical and scientific considerations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency.

DSM-IV, at xxvii. Again, this statement refers to the DSM-IV as a whole and not to GAF scores, in particular. The upshot of these two statements – that non-clinical decision makers must use

caution in employing the DSM-IV for forensic purposes – is echoed in the current version of the DSM (the DSM-5). *See* DSM-5 at 25.[7]

To summarize, the ALJ improperly discounted Dr. Krueger's GAF score on the basis of a significant misreading of the DSM-IV. Contrary to the ALJ's position, the DSM-IV relies quite heavily on GAF scores. As stated:

> Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact and in predicting outcome.
> The reporting of overall functioning on Axis V is done using the Global Assessment of Functioning (GAF) Scale. The GAF Scale *may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure*….

DSM-IV at 30 (emphasis added). While the current DSM does not employ GAF scores, *see* DSM-5 at 16, they were once a useful tool when employed effectively. To say otherwise based on the purported fact that they are not intended for forensic use is a misstatement, unsupported by law[8] or substantial evidence.

---

[7] The DSM-5 drops the use of the GAF scale in general. *See* DSM-5 at 16. It does so because of the GAF's "conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Id.* "Nonetheless, medical providers continue to use GAF scores, as evidenced by this case." *Dalton v. Berryhill*, 2017 WL 6209830, at *7 (D.N.M. Dec. 7, 2017). More importantly, "[a]fter the DSM-V was published, the Social Security Administration issued a directive to its ALJs… instructing them to still consider GAF scores as medical opinion evidence but emphasizing that GAF scores should not be considered in isolation." *Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017).

[8] The Commissioner cites several cases for the proposition that "GAF scores do not necessarily indicate an individual is unable to work," and that the Tenth Circuit has affirmed the failure to discuss GAF scores as low as the one in this case. *See* Doc. 21 at 6 (citing *Rose v. Colvin*, 634 F. App'x 632, 636 (10th Cir. 2015 (unpublished); *Kearns v. Colvin*, 633 F. App'x 678, 681-82 (10th Cir. 2015) (unpublished); *Lopez v. Barnhart*, 78 F. App'x 675, 678 (10th Cir. 2003) (unpublished). The Court agrees that a low GAF score, by itself, is not a sufficient indicator of disability. *See Rose*, 634 F. App'x at 637; *Lopez*, 78 F. App'x at 678 ("[S]tanding alone, the GAF score does not evidence an impairment seriously interfering with claimant's ability to work."). However, the cases that the Commissioner cites are (1) unpublished; and (2) rely on out of circuit precedent for the position that discussion of GAF scores are "not essential to the RFC's accuracy." *See Kearns*, 633 F. App'x at 682 (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)); *Lopez*, 78 F. App'x at 678 (same). *Howard*, however, merely states that "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." *Howard*, 276 F.3d at 241. It is not a license to reject otherwise valid GAF scores when *formulating* a claimant's RFC.

The Court also finds that the ALJ's other reasons for rejecting Dr. Krueger's opinions are unsupported or contrary to case law. The ALJ's first contention is that "the assessment is not supported by evidence of record." *AR* at 27. The ALJ reasoned that because Mr. Nelson has not sought professional counseling or therapy, "there is no evidence to suggest the claimant's psychiatric symptoms would not improve with appropriate treatment." *AR* at 27. However, as the Tenth Circuit recently reiterated, "[t]he absence of evidence is not evidence[.]" *Kellams*, 696 F. App'x at 915 (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993)). To wit, the purpose behind ordering a consultative examination is to adduce additional evidence not contained in a claimant's medical records and to establish the current severity of a claimant's impairments. *See* 20 C.F.R. § 404.1519a(b); *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010) (unpublished) ("[T]he regulations set out exactly how an ALJ is to determine severity, and consideration of the amount of *treatment* received by a claimant does not play a role in that determination. This is because the lack of treatment for an impairment does not necessarily mean that the impairment does not exist or impose functional limitations. Further, attempting to require treatment as a precondition for disability would clearly undermine the use of consultative examinations."). Dr. Krueger's report indicated that Mr. Nelson has severe psychiatric impairments which affect his ability to work. That Mr. Nelson's impairments might improve with treatment is utter speculation by the ALJ, which is not permitted. *See Matlock v. Berryhill*, 2018 WL 1305424, at *8 (D.N.M. Mar. 12, 2018) (citing *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004)).

The ALJ continued, "[f]urthermore, the record shows the claimant was able to work at the semi-skilled and skilled level despite his history of learning disorder and borderline intellectual functioning." *AR* at 27. While this may be true, it does not demonstrate that Mr.

Nelson is able to work at these same levels after his injury. In fact, in addition to his borderline intellectual functioning and learning disorder NOS, the ALJ accepted as true that Mr. Nelson has the severe impairments of depressive disorder NOS, and adjustment disorder with anxiety. *AR* at 15. Yet, she does not provide an explanation as to why Dr. Krueger's diagnoses are acceptable while his opined functional limitations are not. "An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007).

The ALJ's next reason was that "[t]here are no references from Dr. Krueger that the claimant displayed any significant deficits in persistence and pace, which would provide support for his limitation in that area. In fact, he noted the claimant make (sic) good effort and was compliant with following all test instructions." *AR* at 27. The Court finds this reason to be unsupported by substantial evidence. That Mr. Nelson made "good effort" and was compliant with following test instructions led Dr. Krueger to conclude that his WAIS-IV results were valid. *AR* at 715. Yet, the ALJ appears to have ignored these valid, objective, test results; primarily as to Mr. Nelson's Processing Speed Index score of 74, which falls within the fourth percentile. *AR* at 716; *compare Beard v. Colvin*, 642 F. App'x 850, 852 (10th Cir. 2016) (unpublished) ("[T]he ALJ gave no reason for rejecting the objective assessment."). Dr. Krueger reiterated: "[h]e has serious problems with visual motor working speed, as is evidenced by his Processing Speed Index score of 74. . . . He can be expected to have marked impairment with maintaining pace and persistence." *AR* at 717. What "references" the ALJ required of Dr. Krueger's report in order to support his opinion as to Mr. Nelson's ability to maintain persistence and pace are unclear, as it appears as though this is the only evidence concerning Mr. Nelson's processing speed in the record.

The ALJ's last reason for rejecting Dr. Krueger's opinion – that it was based on one evaluation – is invalid as a matter of law where the ALJ's other reasons are unsupported. *See Kellams*, 696 F. App'x at 917 (citing *Chapo*, 682 F.3d at 1291; 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)). While it is true that an ALJ must consider the treatment relationship of a medical source under the regulations, "[t]his rationale may justify refusing to give Dr. [Krueger] the status of a treating physician and according [his] opinion controlling weight, but as an examining source [his] opinion still was entitled to particular consideration. Indeed, 'an examining medical-source opinion is, as such, ... presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record.'" *Id.* In other words, "[a]lthough the lack of a treating relationship is relevant to the weight to be afforded to an opinion, it is not grounds for simply rejecting an opinion." *Crowder*, 561 F. App'x at 743 (citing *Chapo*, 682 F.3s at 1291).

## V. CONCLUSION

"Examining medical-source opinions" are "given particular consideration." *Ringgold*, 644 F. App'x at 843 (quoting *Chapo*, 682 F.3s at 1291). Such an opinion "may be dismissed or discounted, of course, but that must be based on an evaluation of all of the factors set out in the ... regulations and the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* The Court, having carefully reviewed the ALJ's treatment of Dr. Krueger's opinion, finds that the ALJ failed to conform to this standard.

Wherefore, the undersigned recommends that Plaintiff's Motion to Remand or Reverse Agency Decision (*Doc. 15*), be GRANTED, and that this case be remanded for further administrative proceedings consistent with this opinion.

_____
UNITED STATES MAGISTRATE JUDGE

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).
>
> **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**